| | | |
|---|---|---|
| **JACKIE L. KETRON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:10-CV-00428** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Jackie Ketron appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket # 1.) The appeal was referred to the undersigned Magistrate Judge on December 15, 2010, by District Judge Theresa Springmann for the issuance of a Report and Recommendation. (Docket # 5.) Ketron filed an opening brief on May 25, 2011, and the Commissioner responded on September 1, 2011. (Docket # 17, 23.) Ketron, however, failed to file a reply brief, and the time to do so has since passed.

Having reviewed the record and pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72.1, the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED. The Report and Recommendation is based on the following facts and principles of law.

# I.  PROCEDURAL HISTORY

Ketron applied for DIB and SSI in May 2006, alleging that he became disabled as of January 1, 2002. (Tr. 9, 169-76.)  The Commissioner denied his application initially and upon reconsideration, and Ketron requested an administrative hearing. (Tr. 68-168.)  Administrative Law Judge ("ALJ") Terry Miller conducted a hearing on November 19, 2009, at which Ketron (who was represented by counsel) and a vocational expert testified. (Tr. 26-67.)

On February 5, 2010, the ALJ rendered an unfavorable decision to Ketron, concluding that he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 12-18.)  The Appeals Council denied Ketron's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

Ketron filed a complaint with this Court on December 9, 2010, seeking relief from the Commissioner's final decision. (Docket # 1.)  He raises three arguments in this appeal: (1) that the ALJ's step three determination is not supported by substantial evidence; (2) that the ALJ failed to minimally articulate his application of the factors identified in Social Security Ruling 96-7p in assessing the credibility of Ketron's subjective symptom testimony; and (3) that the ALJ failed to minimally articulate a function-by-function assessment of Ketron's residual functional capacity and logically bridge the evidence to his conclusion. (Pl.'s Br. in Supp. of Compl. for Review ("Pl.'s Br.") 18-27.)

## II. FACTUAL BACKGROUND[1]

### A. Background

At the time of the ALJ's decision, Ketron was fifty-two years old; had a tenth grade education; and possessed work experience as a specialty worker, machinist, and interior/exterior painter. (Tr. 17, 34, 169, 174, 196.) He alleges that he became disabled as of January 1, 2002, due to coronary artery disease ("CAD"), seizure disorder, and degenerative disk disease. (Pl.'s Br. 3.)

### B. Ketron's Testimony at the Hearing

At the hearing, Ketron testified that he lives independently in a one-story house owned by his mother, who lives next door. (Tr. 32-33.) He performs his own self care, but his mother prepares his meals and does his laundry and a neighbor does his cleaning. (Tr. 49-50, 56-57.) He has a driver's license but, due to his seizures, does not drive. (Tr. 33, 45-46.) His typical day involves watching television and napping. (Tr. 55-59.)

Ketron reported that he underwent cardiac bypass surgery in 2006 and that his heart is now "stable" and "pretty good." (Tr. 42.) He stated that he experiences seizures about once every two weeks, as well as neck and low back pain at a level "7" on a scale of "1" to "10." (Tr. 44, 59-60.) He takes medications for his various conditions, including Nitroglycerin, Dilantin, and Ibuprofen, which cause him some fatigue. (Tr. 40, 44, 47, 56.)

Ketron said that he can lift eight pounds, walk for one-half of a block, and stand for thirty minutes. (Tr. 40-41, 52-54.) He also stated that due to his neck and low back pain, he cannot sit

---

[1] In the interest of brevity, this Opinion recounts only the portions of the 970-page administrative record necessary to the decision.

in a "hard back chair very long" and usually lies down for four to five hours every day. (Tr. 46-47, 52.)

## C. Summary of the Relevant Medical Evidence

On October 3, 2005, Ketron visited the emergency room and was diagnosed with hemoptysis and hypertension.[2] (Tr. 28.)  In May 2006, Ketron went to the General Medical Clinic, complaining of seizures one to two times per week, foot cramps, and facial lumps. (Tr. 257, 276.)  Blood work results appeared consistent with either alcohol overuse or excessive water intake. (Tr. 267.)  He was diagnosed with multiple sebaceous cysts, hypertension, tobacco abuse, and asthma. (Tr. 276.)  A brain MRI showed a polyp or mucous cyst and nodules on the scalp and neck, but was otherwise negative. (Tr. 258.)

The next month, Ketron complained of a seizure and nightly cramping in his legs, hands, and feet. (Tr. 270.)  The physician diagnosed him with a systolic murmur, questionable alcohol abuse, uncontrolled hypertension, asthma, and a seizure disorder. (Tr. 270.)  Ketron underwent a stress test on July 26, 2006, which showed reduced aerobic capacity (limited by fatigue) and hypertension. (Tr. 288.)  An exercise stress myoview cardiac perfusion study showed findings compatible with the presence of ischemic heart disease. (Tr. 310.)

On August 3, 2006, Ketron visited Dr. Kevin Hart, a cardiologist. (Tr. 372.)  He diagnosed Ketron with exertional dyspnea, history of anterior infarct with significant peri-infarct ischemia and ischemic cardiomyopathy, and hypertension exacerbation. (Tr. 373.)  Dr. Hart recommended that Ketron undergo a cardiac catheterization. (Tr. 373.)  Several days later,

---

[2] Hemoptysis is the spitting of blood from the lungs or bronchial tubes as a result of pulmonary or bronchial hemorrhage. STEDMAN'S MEDICAL DICTIONARY 872 (28th ed. 2006).

Ketron saw Dr. Peter Rossi, who diagnosed him with severe two-vessel CAD, markedly depressed left ventricular function, and an ejection fraction of 35% to 40%. (Tr. 337.)  Ketron also had an ultrasound, which found a small pseudoaneurysm, and an electroencephalogram study, which revealed a mildly abnormal awake and drowsy EEG recording. (Tr. 313, 356.) Ketron agreed to undergo a myocardial revascularization surgery. (Tr. 338.)

On August 17, 2006, Ketron underwent coronary artery bypass graft surgery on two vessels. (Tr. 314, 407-22.)  A chest x-ray showed a normal-sized heart and some mild lung collapse. (Tr. 359.)  The next day, Dr. Fen Lei Chang, a neurologist, evaluated Ketron for his seizures. (Tr. 314.)  On examination, Ketron had a diminished peripheral pulse and 4/5 muscle strength in his extremities, but no chest pain, respiratory problems, or muscle pain or weakness. (Tr. 314.)  Dr. Chang noted that Ketron smoked two packs of cigarettes daily and that he had stopped taking his Dilantin because he did not like how it made him feel; he instructed Ketron to resume the Dilantin. (Tr. 314.)  An EEG showed nonspecific mild encephalopathy but no evidence of any active ongoing seizure activity.[3] (Tr. 313.)  A CT scan showed a probable sebaceous cyst on Ketron's scalp but no acute cranial abnormality. (Tr. 355.)  On August 21, 2006, an x-ray showed increasing fluid on Ketron's right lung, but a repeat x-ray three days later showed significant improvement. (Tr. 358.)

On September 18, 2006, Dr. Rossi noted that Ketron had done well post-operatively and that other than some increased breath sounds, he had a normal chest exam. (Tr. 450.)  He complained of some shortness of breath, however, and an x-ray showed left-sided excess fluid, which the doctors then removed. (Tr. 449-51.)  Two days later, x-rays showed minimal fluid in

_____

[3] An encephalopathy refers to any disorder of the brain. STEDMAN'S, *supra* note 2, at 636.

the left lung. (Tr. 526.)

On October 3, 2006, Ketron was hospitalized due to low sodium levels. (Tr. 468-70.) He stated that he felt well but had intermittent weakness and low back discomfort; he also complained of increased seizures in the past few months. (Tr. 468-69, 472.) He admitted smoking one half to one pack of cigarettes daily, drinking two to three beers daily, and drinking heavily once a week. (Tr. 469, 472.) An echocardiogram revealed mild left ventricular dysfunction with an ejection fraction of 50%, focal wall motion abnormalities, normal pulmonary pressures, aortic valve sclerosis with mild insufficiency, and mild mitral regurgitation without left atrial dilation. (Tr. 489.) Ketron was diagnosed with hyponatremia, hyperkalemia, CAD, uncontrolled hypertension, multiple cystic lesions, and nicotine addiction.[4] (Tr. 466-70, 473.) By October 6, 2006, Ketron's hyponatremia had very much improved and his hyperkalemia had been corrected; he denied any neck, back, or abdominal pain. (Tr. 459.)

On October 19, 2006, Dr. Hart reported that Ketron's cardiac condition was stable. (Tr. 487, 511.) He made no changes to treatment, but asked Ketron to stop smoking. (Tr. 487, 511.) On December 5, 2006, Ketron saw Dr. Chang, who noted that Ketron's recent hospitalization was caused by his stopping the Dilantin on his own because his disliked the side effects. (Tr. 553.) Ketron reported five seizures since that time; Dr. Chang questioned whether Ketron's seizures were non-epileptic and instructed him not to drive. (Tr. 553-55.)

On December 12, 2006, Dr. Michael Holton evaluated Ketron at the request of the Social Security Administration. (Tr. 560-61.) Dr. Holton noted that Ketron had normal gait and station

---

[4] Hyponatremia is an abnormally low concentration of sodium ions in the circulating blood, and hyperkalemia is a greater than normal concentration of potassium ions in the circulating blood. STEDMAN'S, *supra* note 2, at 921, 934.

and normal muscle strength and tone in all extremities, but mild halting features when getting out of a chair or on and off the examination table. (Tr. 561-62.) Ketron's range of motion was characterized by moderate generalized stiffness and overall deconditioning. (Tr. 562.) Dr. Holton diagnosed him with possible seizure disorder, hypertensive cardiovascular disease, chronic obstructive pulmonary disease ("COPD"), and multiple sebaceous cysts. (Tr. 562.)

On December 14, 2006, Dr. Hart reported that Ketron was stable from a cardiac perspective with no chest pain or shortness of breath; he again instructed Ketron to quit smoking. (Tr. 682.) A CT scan showed a small amount of fluid in the left lung with minimal lung collapse or scarring, thickening of the heart's artery walls with post-surgical changes, and mild scarring in the lungs' upper lobes, but an otherwise negative scan. (Tr. 567.) An EEG was normal with no evidence of seizure activity, and spirometry showed an FEV1 of 3.05 liters or 75%. (Tr. 571.)

On January 18, 2007, Dr. J.V. Corcoran, a state agency physician, reviewed Ketron's record and opined that he could lift or carry twenty-five pounds frequently and fifty pounds occasionally, sit for six hours in an eight-hour day, stand or walk for six hours in an eight-hour day, and perform unlimited pushing or pulling, but must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 593-96.) Dr. Corcoran's opinion was later affirmed by Dr. Richard Wenzler, a second state agency physician. (Tr. 619.)

Ketron complained of neck pain on January 23, 2007, and an x-ray revealed minor cervical spondylosis. (Tr. 606.) In February, Ketron reported back pain and wheezing at night. (Tr. 602.) A chest x-ray showed scattered areas of scarring; focal air space disease, which might have been scarring; but no sign of congestive heart failure. (Tr. 607.) On March 9, 2007, Ketron saw Dr. Chang and represented that he had had three seizures in February. (Tr. 608.) Dr. Chang

documented that Ketron had independently reduced his dosage of Dilantin and instructed him not to do so in the future; Dr. Chang was still not convinced that Ketron's episodes were actual seizures. (Tr. 609.)

Ketron was hospitalized for nine days in July 2007 for syncope in the presence of a history of seizure disorder, confusion, and respiratory failure secondary to profound hyponatremia. (Tr. 757-64.) He presented to the emergency room with an altered level of consciousness and was vomiting blood. (Tr. 757, 760.) An EKG showed a 60 to 65% ejection fraction, and a brain MRI showed diffuse central atrophy, but was otherwise normal. (Tr. 698.) A head CT scan showed age-related changes that were somewhat greater than expected for Ketron's age, but an EEG showed no epileptic discharges or abnormality. (Tr. 697, 699.) At discharge, Ketron was doing very well. (Tr. 764-66.) He was diagnosed with COPD, improved hyponatremia, seizure disorder, respiratory distress, gastroesophageal reflux disease, and anemia. (Tr. 764-66.) Nevertheless, the day after discharge, Ketron was readmitted for severe confusion. (Tr. 694.) He was diagnosed with alcohol dependency and psychosis secondary to medical problems, questionable seizure, and was assigned a Global Assessment of Functioning score of 30.[5] (Tr. 694.)

A September 2007 x-ray of Ketron's spine revealed moderate degenerative disk disease and spondylosis at L5-S1, but no acute abnormality of the thoracolumbar spine. (Tr. 965.) A CT scan the next month showed a small amount of fluid in Ketron's left lung and atypical scarring.

---

[5] Global Assessment of Functioning scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id.*

(Tr. 953.)  On October 11, 2007, Dr. Hart again reported that Ketron was stable. (Tr. 674.)  He complained of some diffuse joint and muscular aches without chest pain or shortness of breath. (Tr. 674.)  That same month, Ketron visited Dr. Chang, reporting that he had experienced several seizures in the past month and that he had not been taking his Lamictal. (Tr. 882.)  Dr. Chang again stated that he was not convinced that Ketron's seizures were epileptic; he restarted him on Lamictal. (Tr. 882.)

In November 2007, Dr. Reginald Stiles, a primary care physician, saw Ketron for complaints of back pain, diagnosing him with multiple diffuse joint pain without arthritis. (Tr. 964.)  He wrote a letter "[t]o whom it may concern," stating that he expected Ketron's medical problems, including severe neck arthritis, seizure disorder, and heart problems, to last for at least twelve months. (Tr. 610.)

A December 2007 CT scan showed a small to moderate amount of fluid in Ketron's left lung, increased since his last exam; mild collapse at the left lung base, new from his last exam; post-surgery CAD; and mild emphysema changes. (Tr. 826.)  A chest x-ray taken three months later similarly showed a small amount of fluid in the left lung, emphysema changes, and possible scarring or lung collapse at the left lung base. (Tr. 839.)  On March 2, 2008, Ketron presented at the emergency room with chest pain; however, no underlying cardiac etiology was discovered. (Tr. 834; *see also* Tr. 628.)

On March 7, 2008, Ketron returned to Dr. Chang, reporting that he had one seizure the week before. (Tr. 628.)  He adjusted Ketron's Dilantin and Lamictal, but again opined that he was not quite convinced that all of Ketron's seizures were epileptic. (Tr. 629.)  One week later, Ketron underwent another myocardial perfusion exercise test and echocardiogram. (Tr. 667,

669.)  The results of the stress test were abnormal "with mixed lesion with scar plus ischemia involving the mid and distal anterior segment" and an ejection fraction of 45%, which was consistent with multi-vessel CAD. (Tr. 630.)  The echocardiogram showed mild left ventricle dysfunction "but preserved left ventricular ejection fraction at 60%." (Tr. 630.)  After reviewing the results, Dr. Robert Godley recommended that Ketron undergo a repeat cardiac catheterization, which he did on March 26, 2008. (Tr. 630, 672.)

On May 6, 2008, Ketron still complained of some chest discomfort, but Dr. Hart believed it was due to wires in the sternum. (Tr. 649.)  He opined that Ketron was stable and made no changes to his treatment regime at the time; he again stressed that Ketron should quit smoking. (Tr. 649.)

In October 2008, Ketron saw Dr. Chang, who reported that Ketron had been stable for the past eight months although he had seizures from time to time. (Tr. 640.)  Dr. Chang thought that Ketron's symptoms were atypical for epileptic seizures and that his symptoms might be secondary to panic attacks. (Tr. 640.)  He increased Ketron's Lamictal since it was also a mood stabilizer. (Tr. 640.)  On April 9, 2009, Ketron returned to Dr. Chang, who reiterated his opinion that Ketron's spells might be panic attacks, rather than seizures, and added a new medication to Ketron's treatment regime. (Tr. 636.)

On May 5, 2009, Dr. Hart opined that Ketron was stable from a cardiac standpoint, except for a moderate exacerbation of his hypertension. (Tr. 646.)  Ketron told Dr. Hart that he still smoked one-half to one pack of cigarettes daily. (Tr. 646.)

That same month, Ketron consulted an orthopaedist due to experiencing sharp, intermittent pain in his right wrist, neck, and back, which he rated as an "8" and stated increased

with activity. (Tr. 967.)  He was instructed to take over-the-counter nonsteroidals, given a hand splint, and told to return "as needed." (Tr. 969.)

On August 4, 2009, Ketron had an x-ray of his spine, which showed degenerative disk space narrowing at L5-S1. (Tr. 715.)  He had also sustained a fracture of a finger in his right hand when riding a bicycle. (Tr. 715.)  Ketron visited the emergency room two times that month—once for drainage of a skin abscess and once due to left arm pain. (Tr. 736, 740.)

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### *A. The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[6] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, with respect to steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

claimant is not disabled. *Id.*  The burden of proof lies with the claimant at every step except the

fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

*B. The ALJ's Decision*

On February 5, 2010, the ALJ rendered his decision. (Tr. 12-18.)  He found at step one of

the five-step analysis that although Ketron had worked after his alleged onset date, his work

activity did not rise to the level of substantial gainful activity. (Tr. 11.)  At step two, the ALJ

concluded that Ketron had the following severe impairments: history of multi-vessel CAD, status

post coronary artery bypass graft surgery two times in August 2006; history of seizures; chronic

low back pain due to lumbar spine degenerative disk disease; and COPD. (Tr. 11-12.)

At step three, the ALJ determined that Ketron's impairment or combination of

impairments were not severe enough to meet a listing. (Tr. 12.)  Before proceeding to step four,

the ALJ determined that Ketron's testimony of debilitating limitations was not credible to the

extent it was inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to perform "light" work . . .
> (i.e., lifting/carrying/pushing/pulling up to 20 pounds occasionally and 10 pounds
> frequently, and sitting, standing, and walking up to 6 hours for each work activity
> during an 8 hour workday), with the following additional limitations: he needs a
> sit/stand option, where the individual would need to change positions possibly
> every half hour; occasionally climb ramps and stairs, balance, stoop, kneel and
> crouch; never climb ladders, ropes or scaffolds; need to avoid concentrated
> exposure to pulmonary irritants, i.e., fumes, odors, dusts, gases and poor
> ventilation; and the need to avoid all exposure to hazards, (i.e., work at
> unprotected heights, around dangerous moving machinery and no driving
> commercial vehicles).

(Tr. 13.)  Based on this RFC and the vocational expert's testimony, the ALJ found at step four

that Ketron was unable to perform any of his past relevant work. (Tr. 17.)  The ALJ then

concluded at step five that Ketron could perform a significant number of jobs within the

economy, including cashier, administrative support positions, and counter clerk. (Tr. 18.)
Therefore, Ketron's claims for DIB and SSI were denied. (Tr. 18.)

### C. The ALJ's Step Three Determination Is Supported by Substantial Evidence

Ketron advances several challenges to the ALJ's step three finding: (1) that the ALJ failed
to adequately analyze his heart disease under Listing 4.04; (2) that the ALJ erred by failing to
consider Listing 11.02 for seizure disorders; and (3) that the step three finding is not supported
by substantial evidence because no medical expert expressed an opinion as to whether his
impairments medically equaled a listing. None of Ketron's arguments, however, warrant a
remand of the Commissioner's decision.

To begin, Ketron asserts that the ALJ erred "in claiming that he does not have ischemic
heart disease" when analyzing Ketron's cardiac condition under Listing 4.04, because the record
reflects in at least three places that he indeed was diagnosed with ischemic heart disease. (Pl.'s
Br. 26 (citing Tr. 310, 372, 678).) Ketron's characterization of the ALJ's finding, however, is
abbreviated. More precisely, the ALJ articulated that Ketron did not "have ischemic heart
disease *with the required symptoms and limitations due to myocardial ischemia*." (Tr. 13
(emphasis added).)

An "impairment(s) cannot meet the criteria of a listing based only on a diagnosis." 20
C.F.R. §§ 404.1525(d), 416.925(d). "To meet the requirements of a listing, [a claimant] must
have a medically determinable impairment(s) that satisfies all of the criteria of the listing." 20
C.F.R. §§ 404.1525(d), 416.925(d). Here, Ketron makes no effort to connect the evidence he
cites to the requirements of Listing 4.04 to show that he met all of the Listing's requirements—a
burden that was his to bear. *See Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004); *Sims v.*

*Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) ("[N]one of the evidence that [the claimant] contends the ALJ ignored or misstated establishes that her impairments met or equaled in severity the criteria under [the relevant] listings . . . ."); *Clifford*, 227 F.3d at 868 (explaining that the claimant, not the Commissioner, bears the burden of proof at step three). Therefore, Ketron's first challenge to the ALJ's step three determination is ineffective.

Next, Ketron advances a one-sentence argument that the ALJ erred by failing to consider Listing 11.02 for convulsive epilepsy. (Pl.'s Br. 26.) Of course, the Seventh Circuit Court of Appeals "repeatedly ha[s] made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . ." *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000). At a minimum, Ketron again fails to carry his burden to establish that he met all of the requirements of Listing 11.02. *See Rice*, 384 F.3d at 369-70; *Sims*, 309 F.3d at 429; *Clifford*, 227 F.3d at 868. In that regard, Listing 11.02 addresses convulsive epilepsy, but Dr. Chang repeatedly documented that he thought Ketron's seizures might actually be panic attacks rather than epileptic in nature. (*See, e.g.*, Tr. 554, 560, 609, 629, 636, 640, 882.) Moreover, Listing 11.02 involves epileptic seizures *with loss of consciousness more frequently than once a month*, 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.02; here, Ketron stated that he has only lost consciousness "once" when having a seizure. (Tr. 43-44.) Thus, Ketron's second assertion of error with respect to the ALJ's step three finding falls short of warranting a remand.

Finally, Ketron argues that the ALJ's step three finding is not supported by substantial evidence because no medical expert considered whether his impairments medically equaled a listing. Ketron's argument, however, is unfounded, as Dr. Corcoran and Dr. Wenzler, the state agency physicians, completed Disability Determination and Transmittal Forms opining that

Ketron was not disabled. (Tr. 68-71.)  The Seventh Circuit has articulated that "[t]hese forms conclusively establish that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (internal quotation marks and citations omitted).  Consequently, "[t]he ALJ may properly rely upon the opinion of these medical experts." *Id.* (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see Wadsworth v. Astrue*, No. 1:07-cv-832, 2008 WL 2857326, at *7 (S.D. Ind. July 21, 2008) ("The ALJ need not summon a medical expert to testify at the hearing if a medical expert has signed a disability determination form that addresses whether the alleged impairment equals a listing . . . ."); *see also* Social Security Ruling ("SSR") 96-6p.  Consequently, Ketron's final challenge to the ALJ's step three determination is ineffective.

### D.  The ALJ's Credibility Determination Should Not Be Disturbed

Next, Ketron contends that the ALJ failed to minimally articulate his consideration of the various factors set forth in Social Security Ruling 96-7p when assessing the credibility of Ketron's subjective symptom testimony. The ALJ's credibility determination, however, should not be disturbed.

"Credibility determinations are the second step in a two-step process prescribed by the regulations for evaluating a claimant's request for disability benefits based on pain." *Aidinovski v. Apfel*, 27 F. Supp. 2d 1097, 1103 (N.D. Ill. 1998) (citations omitted); *see Behymer v. Apfel*, 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p.  First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment (that is, an impairment that can be shown by medically acceptable clinical and

laboratory diagnostic techniques) that could reasonably be expected to produce the claimant's pain or other symptoms. *Williams v. Chater*, 915 F. Supp. 954, 964 (N.D. Ind. 1996); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p.  If the record does not allow the ALJ to make such a finding, then that ends the inquiry, for a finding of disability cannot be made solely on the basis of the claimant's symptoms, even if they appear genuine. SSR 96-7p.

If, however, the medical evidence shows the existence of an underlying impairment that could be reasonably expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p; *see Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994); *Williams*, 915 F. Supp. at 964; 20 C.F.R. §§ 404.1529(c), 416.929(c).  "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p.  In making this finding, the ALJ must consider various factors in addition to the objective medical evidence, including the claimant's daily living activities; the location, duration, frequency, and intensity of his pain; factors that precipitate or aggravate the symptoms; the type, dosage, effectiveness, and side effects of any pain medication; treatment, other than medication, that the claimant receives for pain; any other measures that he uses to relieve pain; and any other factors concerning the claimant's functional limitations and restrictions due to pain. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence

"at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ concluded at step one of his credibility analysis that Ketron had an underlying medically determinable physical impairment that could reasonably be expected to produce his pain or other symptoms. (Tr. 14.) At step two, however, the ALJ determined that Ketron's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the . . . [RFC] assessment." (Tr. 14.) It is at this second step where Ketron focuses his challenge to the ALJ's reasoning, contending that the ALJ failed to properly analyze the various factors set forth in SSR 96-7p.

Contrary to Ketron's assertion, the ALJ did indeed adequately consider the factors set forth in SSR 96-7p. First, the ALJ considered the various treatment that Ketron had received, noting that his "compliance with treatment [was] not optimal" and that he had a "recurrent tendency towards medical non-compliance." (Tr. 14-15); *see* 20 C.F.R. §§ 404.1529(c)(3)(iv)-(v), 416.929(c)(3)(iv)-(v) (instructing an ALJ to consider the claimant's use of medication and treatment when determining credibility). In particular, he observed that Dr. Chang indicated that Ketron's recurrent seizure activity was usually associated with noncompliance with his seizure medications. (Tr. 14-15); *see* 20 C.F.R. §§ 404.1529(c)(3)(iii), 416.929(c)(3)(iii) (instructing an

ALJ to consider the precipitating and aggravating factors of the claimant's symptoms). He also took into account, however, that Ketron had at times stopped taking his Dilantin because he did not like its side effects. (Tr. 15); *see* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv) (instructing an ALJ to consider the side effects of a claimant's medication); SSR 96-7p ("The individual may not take prescription medication because the side effects are less tolerable than the symptoms.").

The ALJ further observed that although Ketron thought his back was his main problem, the record was, for the most part, devoid of evidence of treatment for his back. (Tr. 16.) The ALJ is certainly entitled to consider the types of treatment, or lack thereof, that a claimant has undergone when determining that claimant's credibility. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (considering a claimant's use of medications and treatment measures as two factors in analyzing claimant's subjective symptoms); SSR 96-7p; *see Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (finding that claimant's subjective complaints of disabling pain were not entirely credible where the claimant's treatment was "routine and conservative"); *Ellis v. Astrue*, No. 2:09-cv-145, 2010 WL 3782265, at *20 (N.D. Ind. Sept. 30, 2010) (affirming the ALJ's discounting of claimant's complaints of debilitating fatigue given the discrepancies between her self-reported symptoms and the lack of treatment for the purported condition).

Next, the ALJ also considered the objective medical evidence when determining the credibility of Ketron's complaints. *See Eichstadt v. Astrue*, 534 F.3d 663, 558 (7th Cir. 2008) ("The claimant bears the burden of producing medical evidence that supports [his] claims of disability."). He noted that the record reflected that Ketron had recovered fairly well from his August 2006 bypass graft surgery, even returning to some activities requiring light exertion, such

as walking long distances and riding a bike. (Tr. 14.)  He further observed that the records from

Dr. Chang, Ketron's neurologist, questioned whether Ketron's seizures were truly epileptic and,

as discussed above, indicated that his recurrent seizure activity was usually associated with

noncompliance with his seizure medications. (Tr. 14-15.)  In addition, the ALJ considered that

the record depicted Ketron's seizures as generalized shaking without loss of consciousness. (Tr.

14-15.)

In addition, the ALJ took into account that Dr. Hart considered Ketron stable from a

cardiac standpoint and, as articulated earlier, that there was little evidence of any treatment for

Ketron's back complaints. (Tr. 15-16.)  Of course, an ALJ is entitled to consider the objective

medical evidence, or lack thereof, as a factor in assessing credibility. 20 C.F.R. §§

404.1529(c)(2), 416.929(c)(2); SSR 96-7p; *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir.

2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective

medical evidence in the record."); *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ

may consider the lack of medical evidence as probative of the claimant's credibility."); *Crawford

v. Astrue*, 633 F. Supp. 2d 618, 633 (N.D. Ill. 2009) ("[A]n ALJ may properly discount portions

of a claimant's testimony based on discrepancies between [the c]laimant's allegations and

objective medical evidence.").

Furthermore, the ALJ also reviewed Ketron's daily activities when making his credibility

determination, noting that he lives next door to his mother, is able to care for his personal needs,

and spends most of his day napping and watching television. (Tr. 14.)  The ALJ further noted that

he is physically able to drive and ride a bike, but avoids doing so because of his seizures. (Tr. 13-

14.)  Of course, a claimant's daily living activities is one of the factors an ALJ should consider

when determining a claimant's credibility. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p; *see Schmidt*, 395 F.3d at 746-47.

And, contrary to Ketron's assertion, the ALJ did indeed sufficiently consider the location, duration, frequency, and intensity of Ketron's pain and other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p. For example, he noted that Ketron's recurring cysts on his body and face were "very painful" until treated (Tr. 12); that he still complains of chest pains, but had not had any for the two weeks prior to the hearing (Tr. 14); and that due to his back problems he asserts he cannot sit on a hard back chair very long and needs to lie down four to five hours during the day (Tr. 14). He also considered Ketron's report of fatigue following a seizure. (Tr. 14.)

Moreover, the ALJ did indeed credit Ketron's subjective symptom testimony to some extent, acknowledging that his history of heart disease and seizures, chronic low back pain, and COPD were severe impairments. (Tr. 11-12.) Accordingly, to accommodate these conditions, the ALJ restricted Ketron to light work with a sit to stand option, and only occasional postural movements, and avoidance of concentrated pulmonary irritants and exposure to hazards. *See, e.g.*, *Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. Mar. 3, 2008) (affirming the ALJ's credibility determination where he discredited the claimant's symptoms only in part).

In sum, contrary to Ketron's contention, the ALJ adequately considered the credibility of Ketron's subjective symptom testimony in accordance with the factors identified in SSR 96-7p and 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) and ultimately determined that they were not of disabling severity. In doing so, the ALJ adequately built an accurate and logical bridge

between the evidence and his conclusion, and his determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435; *see generally Buckhanon ex rel. J.H. v. Astrue*, 368 Fed. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the opinion as a whole and with common sense."); *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985) ("If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough."). Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, should not be disturbed.

### E. The ALJ Adequately Articulated His Assessment of Ketron's RFC

Finally, Ketron contends that the ALJ erred by failing to articulate a "function-by-function assessment" of Ketron's RFC and logically bridge such evidence to his conclusion. (Pl.'s Br. 23.) In particular, he claims that the ALJ erred by omitting explicit conclusions about his reaching, pushing, pulling, and handling abilities and by failing to consider his impairments in combination in accordance with SSR 96-8p.

"Although the 'RFC assessment is a function-by-function assessment,' the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 327 Fed. App'x 652, 657 (7th Cir. 2009) (unpublished) (quoting SSR 96-8p); *see Willis v. Astrue*, No. 10-207-CJP, 2011 WL 2607042, at *8 (S.D. Ill. July 1, 2011) (rejecting claimant's argument "for a mechanical rule requiring the ALJ to set forth a function-by-function assessment," which "would elevate form over substance," where claimant did not point to evidence in the record that the ALJ overlooked or ignored); *Lewis v. Astrue*, 518 F. Supp. 2d 1031, 1043 (N.D. Ill. 2007) ("[T]he

plain language of SSR 96-8p requires the adjudicator to 'consider, not articulate,' [c]laimant's RFC in a function-by-function basis." (quoting *Corder v. Barnhart*, No. 03 C 9308, 2004 WL 1381125, at *6 (N.D. Ill. May 10, 2004))). Indeed, "[t]he ALJ need not provide a written evaluation of every piece of evidence, but need only 'minimally articulate' his reasoning so as to connect the evidence to his conclusions." *Knox*, 327 Fed. App'x at 657-58 (quoting *Rice*, 384 F.3d at 371).

In *Zatz v. Astrue*, 346 Fed. App'x 107, 111 (7th Cir. 2009) (unpublished), the plaintiff advanced a similar "function-by-function assessment" argument, and the Seventh Circuit held that although the ALJ could have been more explicit in his findings, his duty under SSR 96-8p was not as onerous as the plaintiff suggested. In rejecting the plaintiff's argument, the Seventh Circuit observed that the plaintiff did not produce any evidence that undermined the ALJ's conclusion that the plaintiff had no limitations other than those included in the RFC. Accordingly, the Seventh Circuit articulated that "an ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence." *Id.*; *see Kirk v. Astrue*, No. 09-C0990, 2010 WL 4968148, at *20 (E.D. Wis. Dec. 1, 2010) (rejecting claimant's "function-by-function assessment" argument where the record reflected that he was not limited except as expressed in the RFC).

Here, Ketron, too, fails to point to any evidence that undermines the RFC assigned by the ALJ. That is, although Ketron asserts that the ALJ erred by "omit[ting] explicit conclusions regarding reaching, pushing, pulling and handling" (Pl.'s Br. 24), he does not cite to any medical evidence indicating that he has limitations in such areas. In fact, the record evidences just the opposite, as Dr. Corcoran and Dr. Wenzler explicitly found that Ketron had *no* limitations in

reaching, handling, pushing, or pulling, other than those assigned in connection with his ability to lift and carry. (Tr. 593, 595.)  Therefore, Ketron's assertion that the ALJ committed reversible error by failing to make explicit findings concerning these functions is unpersuasive. *See, e.g.*, *Baker v. Astrue*, No. 1:09-cv-0138, 2010 WL 538228, at *6 (S.D. Ind. Feb. 8, 2010) (concluding that where there was no evidence of limitations in reaching, pushing, pulling, or handling, the ALJ's omission of explicit findings about these functions did not consitute reversible error).

Not to be deterred, Ketron also baldly alleges that the ALJ erred by failing to consider Ketron's impairments in combination in accordance with SSR 96-8p. (Pl.'s Br. 25.)  However, Ketron again fails to cite to any evidence in support of this conclusory argument, and "[n]o evidence in the record suggests that the ALJ failed to consider the combined effects of [Ketron's] impairments." *Robinson v. Apfel*, No. 97 C 8727, 1999 WL 160068, at *7 (N.D. Ill. Mar. 12, 1999).  Rather, the record indicates quite the opposite.  In that regard, the ALJ specifically explained that at step two he must determine whether Ketron has a severe impairment or "combination of impairments," and at step three, that he must consider whether Ketron's impairment or "combination of impairments" meets or equals a listing. (Tr. 10.)  And again, in connection with making the RFC finding, the ALJ acknowledged that he "must consider all of the claimant's impairments, including impairments that are not severe . . . ." (Tr. 10.)  Finally, the ALJ explained that "due to the combination of his impairments" (Tr. 16), he assigned Ketron an RFC that "fully accommodates all the substantiated limitations of record" (Tr. 17).

Indeed, it is quite obvious that the ALJ did not ignore any of Ketron's problems, as he penned with particularity more than five pages about Ketron's various impairments. (Tr. 12-17.)  Furthermore, Ketron does not explain with any specificity how the combination of his current

conditions would have a direct effect on his ability to perform the jobs that the ALJ concluded he could perform, that is, the work of a cashier, administrative support position, and counter clerk. Therefore, Ketron's final contention is no more availing than his foregoing arguments, and, accordingly, it will be recommended that the Commissioner's final decision be affirmed.

## V. CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for Plaintiff and the Commissioner. NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

SO ORDERED.

Enter for this 21st day of October, 2011.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge